CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
10/18/2019

JULIA C. DUDLEY, CLERK
BY: s/ J. Vasquez
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| REMY HOLDINGS INTERNATIONAL, LLC )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>FISHER AUTO PARTS, INC., )<br>)<br>Defendant. ) | Civil Action No. 5:19-cv-00021<br><br>By: Elizabeth K. Dillon<br>United States District Judge |

## MEMORANDUM OPINION

Plaintiff Remy Holdings International, LLC (Remy), a manufacturer and supplier of automotive parts and accessories, alleges claims for breach of contract and unjust enrichment against defendant Fisher Auto Parts, Inc. (Fisher). Remy alleges that Fisher wrongfully withheld payment of more than six million dollars due and owing pursuant to two types of contractual arrangements in the automotive aftermarket—the "core return" program and the "core devaluation credit" program. Remy also alleges that Fisher wrongfully terminated the parties' contracts. Finally, Remy brings an alternative claim for unjust enrichment. Fisher moves to dismiss for failure to state a claim. (Dkt. No. 13.) The court held a hearing on this motion on June 19, 2019. (Dkt. No. 31.)

For the reasons stated below, the court concludes that Remy has plausibly alleged claims for breach of contract, and in the alternative, for unjust enrichment. Fisher's motion will therefore be denied.

## I. BACKGROUND[1]

### A. The Parties

Remy is a Delaware limited liability company with its principal place of business in McHenry, Illinois. Remy and its parent company, BPI Acquisition Company, Inc., are manufacturers and suppliers of automotive parts and accessories. Fisher is an auto parts warehouse distributor incorporated under the laws of the Commonwealth of Virginia, with its principal place of business in Staunton, Virginia.[2]

### B. Remy's Business

Remy and BPI primarily serve the automotive aftermarket, developing and distributing products for a wide variety of vehicle makes and models. Remy specializes in the manufacture and supply of rotating electrical products, including starters, used to initiate an engine's operation, and alternators, used to power the electrical system while the engine is running. Electrical products like starters and alternators have a "core" component that can be recycled and remanufactured for future sale. When Remy receives a recycled core back from one distributor, it can fill another distributor's purchase order by remanufacturing a starter or alternator using that core.

---

[1] The following factual background is primarily taken from the allegations in Remy's complaint, which are accepted as true for purposes of deciding Fisher's motion to dismiss. *See Graves v. Lioi*, 930 F.3d 307, 314 (4th Cir. 2019). The court also considered exhibits attached to the complaint, which are incorporated by reference into the pleadings. *See* Fed. R. Civ. P. 10(c). Finally, Remy alleges that the parties entered into a series of contracts, "including but not limited to" the contracts attached to the complaint. (Am. Compl. ¶ 37, Dkt. No. 28.) Therefore, the court considered other such contracts which were attached to Fisher's motion to dismiss. *See Newton v. City of Charlotte*, No. 3:14-cv-00672-FDW-DSC, 2015 WL 346949, at *2 (W.D.N.C. Jan. 26, 2015) (citing *Blankenship v. Manchin*, 471 F.3d 523, 526 n.1 (4th Cir. 2006) (stating that the court may consider "documents attached to the motion to dismiss, so long as they are integral to the complaint and authentic")).

[2] The parties are completely diverse and the amount in controversy exceeds $75,000. (*See* Am. Compl. ¶ 5 (outlining the citizenship Remy's various members).) Thus, the court may exercise subject matter jurisdiction. *See* 28 U.S.C. § 1332(a)(1).

Remy sells both new and remanufactured products to distributors. The distributor, in turn, sells the finished products to its customers with a core deposit on the units sold. As these customers install the product, they bring the old core back to the distributor to receive the core deposit, and the old cores are subsequently recycled back to Remy.

In the automotive aftermarket space, suppliers like Remy traditionally supply finished products to distributors without charging for the core component of the products. The distributor thus receives the core without initially paying for it, with the understanding that the supplier has the right to receive a core (or equivalent value) back in the future. Generally, the distributor regularly returns cores back to the supplier during the commercial relationship, and periodically performs an inventory reconciliation with the supplier, ultimately paying out on any core shrinkage. This industry practice is known as the "cashless core right of return" program.

**C. Remy and Fisher's Commercial Relationship**

In 2014, a Remy affiliate acquired USA Industries (USA), who for many years had sold rotating electrical products to Fisher. The relationship between Fisher and USA was memorialized in a series of Letters of Understanding (LOUs). A December 2012 LOU between Fisher and USA stipulated that "should USA sell part or all of their business . . . all aspects of this contract . . . shall continue forward," and "in no way will Fisher be penalized . . . in the event of a sale, merger or any other type of M&A activity." (December 12, 2012 LOU ¶ 11, Dkt. No. 14-2.)

In January 2015, Fisher and Remy executed a LOU Amendment. (Compl., Ex. B, Dkt. No. 1-3.) In the 2015 LOU Amendment, Remy represented that it "wishe[d] to continue to fully support Fisher with all aspects of past Fisher/USA agreements and [LOUs], except as specifically included in this Amendment." (*Id.* ¶ 1.) Fisher re-designated Remy as its "primary

supplier" and "confirm[ed] their relationship for an additional five-year period" running from January 1, 2015 through January 1, 2020. (*Id.* ¶ 2.) The parties executed a subsequent LOU Amendment in May 2016 with nearly identical terms. (*See* Dkt. No. 14-1.) Both LOU Amendments between Fisher and Remy included identical language regarding Fisher's right to terminate the parties' relationship. Specifically, the LOUs stated that "Remy shall take best efforts to ensure that Remy provides competitive products to Fisher," but provided that "if this doesn't occur in Fisher's opinion then Fisher can change suppliers and end this contract with as little as 60 days of advance notice." (Compl., Ex. B ¶ 2.)

Fisher is also a leading member of a large purchasing group called the Automotive Parts Services Group (APSG or the Group). Among other activities, the Group negotiates and enters into contracts with suppliers such as Remy. Remy refers to one such arrangement as the April 2015 Group Contract. (*See* Compl., Ex. A, Dkt. No. 1-2.) Fisher considers this document to include the terms and conditions of Remy's buying program (the Program). As discussed below, Fisher maintains that it is not a party to this purported contractual arrangement, and that the Program is not an enforceable contract.

Remy contends that, pursuant to the April 2015 Group Contract, the Group agreed to purchase products from Remy as a "preferred vendor" for a period of five years. This contract includes multiple provisions, including clauses related to invoice pricing, price guarantees, shipping, payment, rebates, and warranties. In addition to these provisions, the April 2015 Group Contract also has a provision for "Core Pricing," which sets forth the terms of a specific pricing concession (among others) given to Fisher and other Group members in exchange for their agreement to use Remy as a preferred vendor. Under this arrangement, Remy alleges that Fisher knew that Remy did not—and would not—charge for the core component of any

4

purchased product at the time of the sale.  Rather, Fisher and Remy agreed to conduct a "core reconciliation" every six months, in order to track the core balances and determine any payables owed to Remy.  This agreed-upon Core Pricing Provision memorializes the industry-standard "cashless core right of return" program—a program in which Fisher knowingly participated for years, both with Remy and its predecessor suppliers.  The Group Contract also contains a "keep competitive clause."  Remy alleges that under this clause, Fisher agreed that if it "determines and documents that the market has shifted, we will work closely with [Remy] in order to take corrective action.  A time period of 60 days will be allocated for such measures."

Fisher and Remy also signed several agreements concerning core ledger balance liability between the parties.  During the parties' relationship, when Fisher acquired a warehouse distributor that, unlike Fisher, had an agreement to "repay REMY for cores," it became necessary to resolve the acquired company's core balance.  (*See* Rotating Electrical Core Acquisition Payment Agreement (Oct. 24, 2017) (the Core Acquisition Agreement) ¶ a(ii)(i), Dkt. No. 14-3.)  This industry practice is known as the "core devaluation credit" program.  The parties' express understanding was that, after the acquired company's core balance was addressed, "all future purchases by the acquired company w[ould] be governed by the base core agreement between Fisher and REMY," under which there was no core balance.  (*Id.* ¶ a(ii)(ii).)  In October 2017, the parties executed three agreements addressing this scenario.

The first agreement, printed on Remy letterhead, is called the Rotating Electrical Core Base Agreement (the Core Base Agreement).  (Compl., Ex. C, Dkt. No. 1-4.)  The Core Base Agreement was meant to "memorialize [the parties'] understanding regarding the remaining core ledger balance liability amount owed and obligations between the Parties with regards to this Core agreement and any future acquisitions where there is a core balance as part of the balance

sheet of any acquired company." (*Id.* at 1.) More specifically, the Core Base Agreement clarified that the only "remaining 'core ledger balance'" between the parties was $433,245.47, and that this balance would decrease on a monthly basis. (*Id.* ¶ a.) This balance stemmed from the core ledger balance owed to Remy by KOI Auto Parts, which Fisher acquired in 2014.[3] With the exception of this balance, the agreement stated that "[n]o additional monies, credits or payments for KOI, Fisher Auto Parts or any other past acquisition shall be paid by Fisher back to REMY." (*Id.* ¶ c.) The agreement also provided that it "supersede[d] and replace[d] any and all agreements with regards to core ledger balances and any obligations or liability on the part of Fisher to repay said core ledger balances unless agreed to in writing by both parties." (*Id.* ¶ d.) Further, the agreement required that any additional "liability on the part of Fisher" to pay a core balance must be "agreed to in writing by both parties." (*Id.*)

The second agreement, the Core Acquisition Agreement, memorialized the agreed framework between Fisher and Remy "regarding any future acquisitions where there is a core balance as part of the balance sheet of any acquired company." (Core Acquisition Agreement 1.) The terms of the agreement turned on whether the acquired companies already carried Remy products, and whether the companies "ha[d] agreements with REMY that require them to repay REMY for cores." (*Id.* ¶ a(ii)(i).) After an acquired company's core balance, if any, was addressed, the Core Acquisition Agreement provided that "all future purchases by the acquired company w[ould] be governed by the base core agreement between Fisher and Remy." (*Id.* ¶ a(ii)(ii).)

The third agreement, the "Rotating Electrical Core Agreement Hoffman Acquisition," also printed on Remy letterhead, addressed Fisher's recent acquisition of certain Hoffman

---

[3] As set forth below, Remy refers to this agreement as the KOI Contract in their complaint.

Brothers stores and the "core ledger balance" associated with that acquisition. (Compl., Ex. D, Dkt. No. 1-5 (Hoffman Acquisition Agreement).) The Hoffman Acquisition Agreement increased the "core ledger balance amount" by $94,949.04, but otherwise preserved the terms of the Core Base Agreement. (*Id.* ¶ a.) As with the Core Base Agreement, the Hoffman core balance would also decrease on a monthly basis. (*Id.* ¶ b.) The Hoffman Acquisition Agreement satisfied the terms of the Core Base Agreement, which required any changes to the "obligations or liabilities" relating to core balances to be "agreed to in writing by both parties." (Core Base Agreement ¶ d.)

### D. Fisher's Alleged Contractual Breaches

In early 2018, Fisher communicated to Remy its concerns regarding Remy's performance as a supplier. On June 18, 2018, a Fisher representative e-mailed Remy with the following two-line message: "there may be an understanding that contemplates a 60-day written notice in the event that we wish to officially terminate our agreement. This email serves as that official notice of termination."

In addition to terminating the primary supply arrangement, Fisher has refused to pay three separate invoices related to the core return and core devaluation credit programs. First, Fisher has refused to pay Remy for its outstanding core balance. Remy shipped 107,764 rotating electrical cores to Fisher without a corresponding core return or payment having been made, resulting in a $5,874,829.08 core balance. Remy invoiced that balance amount to Fisher on August 17, 2018, on 90-day payment terms. Fisher never responded to Remy and never paid the invoice.

Second, Fisher has refused to pay a $252,726.39 balance owed in relation to core credits given by Remy to Fisher when Fisher acquired KOI Auto Parts. Remy agreed to credit Fisher

7

for the acquired company's core balance amount over a set time period, so long as Fisher maintained the supply relationship with Remy. Consistent with this practice, Remy provided credits to Fisher under a separate but related agreement (the KOI Contract),[4] pursuant to which the parties unambiguously agreed that in "the event there is an early termination before 12/30/2020 . . . Fisher shall pay to Remy" a predetermined amount based on the number of months remaining on the KOI Contract. As a result of Fisher's early termination, on August 17, 2018, Remy invoiced Fisher the KOI core balance amount, $252,726.39, requesting payment in 90 days. Once again, however, Fisher did not respond, and did not pay the invoice.

Third, Fisher has refused to pay a comparable balance related to a different business acquisition by Fisher. Under the parties' October 2017 agreement concerning Fisher's acquisition of Hoffman Brothers Auto Parts (the Hoffman Contract or Hoffman Acquisition Agreement), Fisher similarly agreed that if it changed suppliers "within the next 36 months," it would pay core credits back to Remy based on the number of months remaining on the contract. As a result of Fisher switching suppliers, on August 17, 2018, Remy invoiced the Hoffman Brothers core balance amount, $71,211.81, to be paid in 90 days. Once again, Fisher did not respond or remit payment.

## II. DISCUSSION

### A. Standard of Review

A complaint attacked by a Rule 12(b)(6) motion to dismiss will survive if it contains enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has

---

[4] As discussed above, Fisher refers to this agreement as the Core Base Agreement. (Compl., Ex. C, Dkt. No. 1-4.)

facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Factual allegations must be enough to raise the right to relief above the speculative level." *Twombly*, 550 U.S. at 555. When considering a motion to dismiss, a court must "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). "Determining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### B. Breach of Contract

Under Virginia law,[5] the essential elements for a breach of contract are: (1) a legally enforceable obligation of a defendant to a plaintiff; (2) defendants' breach or violation of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation. *See O'Connor v. Sand Canyon Corp.*, No. 6:14-cv-00024, 2015 WL 225423, at *5 (W.D. Va. Jan. 16, 2015). Remy's complaint plausibly alleges these elements.

#### 1. Remy's buying program

In counts one and two of Remy's complaint, Remy alleges that Fisher violated several obligations arising from the April 2015 Group Contract, formed as part of Remy's buying program (i.e., the Program).[6] As described above, this Group Contract (and series of contracts) includes clauses related to invoice pricing, price guarantees, shipping, payment, rebates, and warranties, and it memorializes the industry standard "cashless core right of return" program.

---

[5] The parties agree that Virginia law governs this dispute.

[6] Remy based this claim on Revision #9 of the Program. (*See* Compl., Ex. A.) A later revision (Revision #10) was the version in place when Fisher and Remy executed several written agreements in October 2017. Revision #11 was in effect when Fisher sent Remy a termination notice in June 2018. (Dkt. No. 14-4 at 1.)

9

Fisher argues that the Program is not an enforceable contract, which requires an offer, acceptance, and valuable consideration. *See Neil v. Wells Fargo Bank, N.A.*, 596 F. App'x 194, 196 (4th Cir. 2014) (citing *Chang v. First Colonial Sav. Bank*, 410 S.E. 2d 928 (Va. 1991)). Fisher contends that the Program does not set forth unqualified acceptance to purchase products at a certain price and in a certain quantity. Instead, the Program reflects a starting point for negotiations between Remy and individual APSG members—a so-called "agreement to agree." Remy alleges, however, that the parties "have engaged in a cashless core right of return program for years." (Am. Compl. ¶ 15.) Leading up to June 2018, Fisher used Remy as its primary supplier, returned cores to Remy, and worked with Remy on the inventory reconciliation process. (*Id.* ¶ 24.) "In November 2016, for example, a Senior Product Director for Fisher sent to Remy a detailed and specific list of 'Remy Units On Hand' at Fisher's retail locations and distribution centers, in response to Remy's request for an 'ending inventory for all locations . . . as we are doing the year-end core reconciliation." (*Id.*) These and other allegations are sufficient to state a claim that the April 2015 Group Contract and related Group contracts impose enforceable obligations on Fisher. *See Allen v. Aetna Cas. & Sur. Co.*, 281 S.E.2d 818, 820 (Va. 1981) (stating that for a contract to be enforceable, "there must be mutual assent of the contracting parties to terms reasonably certain under the circumstances"); *Cyberlock Consulting, Inc. v. Info. Experts, Inc.*, 876 F. Supp. 2d 672, 678 (E.D. Va. 2012) ("In considering whether an agreement is an enforceable contract or merely an agreement to agree, courts consider whether the document at issue includes the requisite essential terms and also whether the conduct of the parties and the surrounding circumstances evince the parties' intent to enter a contract.").

Remy plausibly alleges that its buying program is an enforceable contract, to which Fisher is a party.[7]

### 2. Count one: outstanding balances

Count one seeks payment for the following outstanding balances: $5,874,829.08 for unreturned cores, $252,726.39 in relation to core credits for the KOI acquisition, and $71,211.81 in relation to core credits for the Hoffman Brothers acquisition. (Am. Compl. ¶ 39(a).)

Regarding the first amount, Remy alleges that "despite engaging in a cashless core right of return arrangement with Remy for years, and despite clear obligations set forth in the Core Pricing Provision, among others, Fisher has refused to pay Remy for its outstanding core balance." (Am. Compl. ¶ 32.) Remy claims to have shipped "107,764 rotating electrical cores to Fisher without a corresponding core return or payment having been made, resulting in a $5,874.829.08 core balance." (*Id.*) Thus, Remy's claim for the first-listed outstanding balance is premised on Fisher's alleged breach of Remy's buying program.

In addition to arguing that this claim should be dismissed because the Program is not an enforceable contract—an argument the court rejects at the pleading stage of these proceedings—Fisher argues that this claim is foreclosed by the Core Base Agreement (i.e., the KOI Contract), which provides that "[n]o additional monies, credits or payments for KOI, Fisher Auto Parts or any other past acquisition shall be paid by Fisher back to Remy." (Core Base Agreement ¶ c.) However, the Core Base Agreement addresses the core ledger balance liability associated with the KOI acquisition—the core devaluation credit program—not the cashless core right of return

---

[7] Fisher also argues that it is not a party to the Program because it did not sign the Program. (*See* Compl., Ex. A.) The absence of a signature indicating acceptance does not necessarily mean that Fisher is not a party to this contract. *See Galloway Corp. v. S.B. Ballard Constr. Co.*, 464 S.E.2d 349, 356 (Va. 1995) (stating that the "absence of an authorized signature does not defeat the existence of the contract").

11

program. (*See id.* at 1 ("The Parties wish to memorialize their understanding regarding the remaining *core ledger balance liability* amount owed and obligations between the Parties with regards to this Core Agreement and any future acquisitions where there is a core balance as part of the balance sheet of any acquired company."); ¶ d (stating that this agreement "supersedes and replaces any and all agreements with regards to *core ledger balances* and any obligations or liability on the part of Fisher to repay said core ledger balances unless agreed to in writing by both parties or as a result of future acquisitions") (emphases added).) Fisher's argument here conflates the two programs. At minimum, Remy has stated a plausible claim that the Core Base Agreement is inapplicable to the workings of the cashless right of return program.

Regarding the other two amounts, Fisher argues that they are premised on Fisher's alleged breach, collectively, of the Program, the Core Base Agreement, and the Hoffman Acquisition Agreement. Thus, because the Program is not an enforceable contract, and because these additional claims are tethered to the terms of the Program, Fisher contends that they also must fail as a matter of law. Again, the court does not agree that the Program is an unenforceable contract. In any event, these claims are not tethered to or reliant upon the Program in the first instance.

The Core Base Agreement addresses the "core ledger balance" relating to KOI and provides as follows:

> In the event there is an early termination before 12/30/2020 of this agreement for any reason, Fisher shall pay to REMY $12,034.59 times the number of months remaining until the end of the 36 months. For example, if 26 months from January 1st 2017 Fisher changes REMY to another brand in the Hoffman stores, then the only amount that Fisher would pay is 10 months x $12,034.59 = $120,345.9. No additional monies, credits or payments for KOI, Fisher Auto Parts or any other past acquisition shall be paid by Fisher back to REMY.

12

(Core Base Agreement ¶ c.)  Again, the court does not view this language as tethered to or reliant on Remy's buying program.  Instead, the Core Base Agreement explains in a straightforward manner that if Fisher terminates the relationship before the end of 2020, Fisher must reconcile the remaining core ledger balance at a rate of $12,034.59 per month for the months remaining until December 30, 2020.  The Hoffman Acquisition Agreement contains identical repayment language.  (*See* Hoffman Acquisition Agreement ¶ c ("[I]f Fisher changes over REMY to another brand in the Hoffman Brothers stores within the next 36 months, Fisher shall pay to REMY $2,637.47 times the number of months remaining until the end of the 36 months.").)  These are plausible claims for relief.

In sum, Remy's complaint states a claim for breach of the Program, the Core Base Agreement, and the Hoffman Acquisition Agreement.  Fisher's motion to dismiss will be denied as to count one.

### 3. Count two: wrongful termination

In count two, Remy alleges that Fisher wrongfully terminated the parties' preferred supply arrangement.  (Am. Compl. ¶¶ 41–45.)  Remy alleges that Fisher unilaterally terminated the parties' agreements without legal basis and without giving Remy the opportunity to discuss or cure any competitiveness issues.  (*Id.* ¶¶ 26, 30.)  The court finds that this is a plausible claim for relief because the Program contains a provision whereby Fisher agreed that if it "determines and documents that the market has shifted, resulting in an uncompetitive situation, we will work closely with Remy Power Products in order to take corrective action.  A time period of 60 days will be allocated for such measures."  (Compl., Ex. A at 2.)

### C. Unjust Enrichment

In count three, Remy requests, in the alternative to its breach of contract claims, disgorgement of the benefit conferred upon Fisher by virtue of its non-payment of core balances. (Am. Compl. ¶¶ 46–50.) If the underlying contract or contracts are found to be unenforceable, then Remy should be allowed to pursue unjust enrichment as an alternative avenue for relief. *See Hyundai Emigration Corp. v. Empower-Visa, Inc.*, Case No. 1:09cv124 (GBL), 2009 WL 10687986, at *8 (E.D. Va. June 17, 2009) ("Under Federal Rule of Civil Procedure 8(e)(2), a party may plead claims in the alternative. Likewise, the Fourth Circuit expressly recognized a plaintiff's ability to plead breach of contract and unjust enrichment claims alternatively.") (citing *Great-West Life & Annuity Ins. Co. v. Info. Sys. & Networks Corp.*, 523 F.3d 266 (4th Cir. 2008)).

### III. CONCLUSION

For the reasons set forth above, Remy's complaint states plausible claims for breach of contract, wrongful termination of contract, and unjust enrichment. The court will therefore deny the motion to dismiss. An appropriate order will be entered.

Entered: October 18, 2019.

/s/ *Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge