IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| **REMY HOLDINGS INTERNATIONAL LLC,** )<br>)<br>*Plaintiff/Counterclaim Defendant,* )<br>)<br>v. )<br>)<br>**FISHER AUTO PARTS, INC.,** )<br>)<br>*Defendant/Counterclaim Plaintiff.* )<br>) | Civil Action No.: 5:19-cv-00021 |

**MEMORANDUM OF LAW IN SUPPORT OF REMY'S OMNIBUS MOTION IN LIMINE**

In support of its *Omnibus Motion in limine*, Plaintiff Remy Holdings International, LLC ("Plaintiff" or "Remy"), by counsel, states as follows:

### I.   INTRODUCTION

This case is simple.  A remanufacturer of rotating electrical automotive parts, Remy, entered into a series of supply agreements with a large warehouse distributor, Fisher.  A critical component of this business relationship was the circulation of the "cores" of those products that may be reused to create remanufactured starters and alternators.  Along the way, the remanufacturer agreed to stop charging a "core charge" upon shipment of each finished good unit to the warehouse distributor.  From that point forward, a period of 14 years, the warehouse distributor paid no core charge.  At the same time that the parties made that switch to "zero core billing", they conducted an audit to determine the total value of the warehouse distributors previous core investment.  That total value was then divided into monthly "core devaluation payments" which were made by the remanufacturer to the warehouse distributor until the warehouse

distributor's previous core investment was paid off. Once the last payment was made, the warehouse distributor lost any "ownership" interest in the cores, and they were entirely owned by the remanufacturer. The contemporaneous accounting records of both companies showed that the cores were on the balance sheet of the remanufacturer and not on the balance sheet of the warehouse distributor.

The parties' contractual relationship ended on July 1, 2018 when the warehouse distributor opted to switch suppliers in the rotating electrical product category. The new supplier made a physical count of the old supplier's core inventory in the possession of the warehouse distributor, valued it at $6.9M, and negotiated a payment for it of $6.5M. In violation of industry practice and the governing contract terms, the warehouse distributor failed to pass along the payment the original supplier for the value of those cores. This case represents the chance for the original remanufacturer to recover its ownership interest in those cores.

With this general backdrop, Remy filed suit against Fisher Auto Parts, Inc. ("Fisher") for breach of contract, alleging that Fisher failed to return the cores Remy had purchased from Fisher via an agreed upon core devaluation program outlined within the letters of understanding and other contracts between the parties.

Pursuant to ECF 229, Remy filed a motion in limine on four (4) topics. Those topics are the current ownership of Remy and the claims at issue, Fisher's repeated reference to Remy contracts with other parties not involved in this litigation, i.e. not contracts between Fisher and Remy, the quantum of Fisher's alleged damages for its counterclaim, and anticipated reference to Remy annual financial audits.

## II. STANDARD OF REVIEW

Although not specifically provided for in the Federal Rules of Evidence, motions in limine "ha[ve] evolved under the federal courts' inherent authority to manage trials." *Intelligent Verification Sys., LLC v. Microsoft Corp.*, No. 2:12-cv-525, 2015 U.S. Dist. LEXIS 43042, at *31 (E.D. Va. Mar. 24, 2015) (*citing United States v. Verges*, No. I:13cr222, 2014 U.S. Dist. LEXIS 17969, 2014 WL 559573, at *2 (E.D. Va. Feb. 12, 2014)). A motion in limine allows the trial court to rule in advance of trial on the admissibility of anticipated evidence. *United States v. Payne*, Civil Action No. 7:16-cr-00014, 2016 U.S. Dist. LEXIS 137377, at *5 (W.D. Va. Oct. 4, 2016) (*citing Luce v. United States*, 469 U.S. 38, 41 n. 4, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984)). "The purpose of a motion in limine is to allow a court to rule on evidentiary issues in advance of trial in order to avoid delay, ensure an even-handed and expeditious trial, and focus the issues the jury will consider." *Verges*, 2014 WL 559573 at *2. "A motion in limine to exclude evidence . . . should be granted only when the evidence is clearly inadmissible on all potential grounds." *Emami v. Bolden*, 241 F. Supp. 3d 673, 681 (E.D. Va. 2017) (emphasis added).

Moreover, generally speaking, "Rule 401 of the Federal Rules of Evidence defines relevant evidence as evidence having "any tendency to make a fact [of consequence in determining the action] more or less probable than it would be without the evidence." Fed. R. Evid. 401. Evidence which is not relevant is not admissible. Fed. R. Evid. 402." *Bans Pasta, LLC v. Mirko Franchising, LLC*, Civil Action No. 7:13-CV-360, 2014 U.S. Dist. LEXIS 203745, at *4 (W.D. Va. Dec. 29, 2014). However, "[u]nder Rule 403, a court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or" if it would waste time. Fed. R. Evid. 403; *Mavity v. MTD Prods.*, 714 F. Supp. 2d 577, 586 n.7 (W.D. Va. 2010).

### III.     RELEVANT FACTUAL BACKGROUND

Fisher sells aftermarket automotive parts as a warehouse distributor, as a wholesale dealer, and in its own consumer retail stores. United Starters and Alternators Industries, Inc. ("USA") became one of the primary suppliers, if not *the* primary supplier, to Fisher for rotating electrical parts in alternators and starters or "cores" (the "Cores"). To solidify this supplier relationship Fisher and USA entered into two Letters of Understanding, one dated December 15, 2011 and a second dated December 11, 2012 ("Fisher/USA LOUs"). The Fisher/USA LOUs both explained that "Core Devaluation Monies will be paid to Fisher on each acquisition, USA is in the process of paying down Fisher cores and this multi-year effort will continue until Fisher cores are paid off." The Fisher/USA LOUs did not state that Fisher owned the Cores and did not reference the USA Core Policy which claimed that Fisher owned the Cores. In anticipation of terminating its contractual relationship, Fisher employee and eventual corporate designee, Greg Haan, on May 2, 2018, conducted a detailed analysis of the value of the Remy cores in Fisher's possession. MPA and Fisher agreed that there were 130,810 units worth $6,904,039. Motorcar Parts of America, Inc. ("MPA") agreed to pay $6.5 million for the 130,810 Cores in Fisher's possession as a part of their new supply relationship with Fisher. Fisher had represented to MPA that its Cores were an asset with zero cost. Fisher never passed any of the $6.5 million they received from MPA for the Cores to Remy. This is the gravamen or genesis of the claim in this matter.

Throughout the relevant timeline involved in this matter, Remy has had multiple predecessors and successors in interest. Starting in the 1990s, USA was the primary supplier of rotating electrical to Fisher. Originally, those products were supplied pursuant to a Core Liability Program. In 2005, Fisher and USA switched to a CROR Program; Fisher stopped paying for Core, and USA agreed to buy down Fisher's previous core inventory over 12 years.

Effective January 13, 2014, the assets of USA inclusive of the Fisher contract were bought by Remy. BorgWarner acquired Remy International in Nov. 2015 because it was interested in the long-term ownership of Remy International's business units unrelated to the light vehicle unit which serviced Fisher. That light vehicle unit was never integrated into BorgWarner because BorgWarner always planned to spin it off. That spin off was the subject of an effort at BorgWarner code named Project Rucker. As part of Project Rucker, BorgWarner assembled a detailed prospectus to assist potential buyers in performing their due diligence. The Project Rucker documents include two memos prepared by Bolt in which she describes the Core Liability and CROR programs. Project Rucker also included a detailed list of CROR customers and balances at BorgWarner representing the Core assets in the possession of BorgWarner customers that were part of the business unit being sold. This listing includes Fisher, as the second largest customer. It shows a core balance owned by BorgWarner in Fisher's possession of $1,313,000 equating to a market value in excess of $6.5M. This listing was reviewed and relied on by Mike Caruso, an employee of Brake Parts Inc., as he oversaw the due diligence for his employer in the run up to its acquisition of the business unit. Brake Parts, Inc., ran the business unit until it was sold to BBB on Nov. 9, 2018. BBB was not interested in acquiring a lawsuit against Fisher, so the rights to that lawsuit were placed in the ownership of the current Plaintiff. Remy believes that Fisher may try to elicit testimony regarding the fact that Remy is no longer an operating remanufacturer but is instead a holding company created the sales activity noted above and held by a private equity firm, Torque Capital.

While it was an operating remanufacturer, Remy had business relationships with many different companies. Each of these relationships was defined by its own contractual terms and obligations. These contractual relationships were subject to negotiation and compromise between

Remy and the other entity. Throughout the many depositions taken during discovery in this matter, Fisher has repeatedly questioned witnesses about the terms contained within other contractual relationships that do not include Fisher. However, in most cases, these terms were not included within the Remy/Fisher contractual arrangement.

As a response to Remy's Second Amended Complaint, Fisher asserted numerous counterclaims against Remy. Count I of those counterclaims relates to order fill rates and Remy's alleged failure to adhere to a sufficient order fill rate to keep Fisher competitive in the marketplace. Essentially, Fisher argues that because Remy failed to maintain an acceptable level of order fill, it lost sales and Remy should be held liable for those lost sales.

In its attempts to substantiate its counterclaim, Fisher relies upon the testimony of Peter Kornafel regarding the "widely-accepted industry customs and trade standards" related to acceptable order fill rates. In his expert report, Mr. Kornafel readily admitted that Remy never reached a 100% order fill rate, which is not uncommon in the industry. Indeed, Mr. Kornafel acknowledged that several Remy documents produced in this litigation further confirm that Remy needed to consistently maintain an order-fill rate in the low-to-mid 90s to keep Fisher competitive. In his report, Mr. Kornafel opined that the industry standard is 90%. However, even with its own expert witness acknowledging that 100% order fill is not the industry standard, Fisher persists in its attempts to recover 100% of allegedly lost sales.

As a part of its business operation, USA and Remy routinely underwent financial audits. In these audits, accounting firms would assess the financial systems in place. These audits would sometimes find areas in which USA or Remy could better their financial systems. In one audit, the auditor found a "material weakness" in the timing of Remy's reconciliation process for its cores.

6

This material weakness was not related to Fisher, does not mention Fisher, and instead only stems from the *timing* of core reconciliations.

## IV.  ARGUMENTS

Each of the four (4) following motions in limine should be granted by the Court.  These motions in limine focus on preventing Fisher from admitting or eliciting irrelevant evidence and/or testimony, confusing the jury, and pursuing lines of inquiry with probative value vastly outweighed by unfair prejudice to Remy.

### a.  REMY OWNERSHIP

"Rule 401 of the Federal Rules of Evidence defines relevant evidence as evidence having "any tendency to make a fact [of consequence in determining the action] more or less probable than it would be without the evidence." Fed. R. Evid. 401. Evidence which is not relevant is not admissible. Fed. R. Evid. 402."  *Bans Pasta, LLC v. Mirko Franchising, LLC*, Civil Action No. 7:13-CV-360, 2014 U.S. Dist. LEXIS 203745, at *4 (W.D. Va. Dec. 29, 2014).

Remy believes Fisher will introduce evidence and/or testimony during the trial to establish that Remy is no longer an active remanufacturer and is owned by a private equity firm, Torque Capital.  In doing so, Remy believes, that Fisher will attempt to insinuate to the jury that Remy is no longer invested in the industry and/or does not need the money to continue operating.  At a high level, to be relevant in this case evidence must relate to the contractual relationship of Remy and Fisher, the ownership of cores, or order fill rates.  The ownership of Remy does not impact any of these issues.  Whether Remy is owned by a private equity firm is of no import to this matter and any such testimony or evidence should be precluded from trial.  Remy is its own business entity, and its ownership is not at issue.

### b. OTHER CONTRACTS

The next issue is whether Fisher should be able to admit evidence or elicit testimony related to Remy contracts with businesses other than Fisher. At issue in this case is the contractual relationship and obligations between Remy and Fisher. Whether Remy had a different contractual arrangement with ACME Corp. has no relevance whatsoever to this matter. The conduct of Remy and Fisher is governed and evaluated by those contracts, not contracts between other parties.

Evidence as to the terms of other contracts with other persons by one of the parties was not relevant. *Featherstone Foundry & Mach. Co. v. Criswell*, 36 Ind. App. 681, 684, 75 N.E. 30, 31 (1905) (citing Reynolds's Stephen, Evidence (2d ed.), Art. 10, p. 20, notes (a), (2)). Federal courts also agree that terms contained within other contracts are not "facially relevant" to a breach of contract action. In deciding a discovery dispute, which has a much more expansive relevance standard, the United States District Court for the District of Columbia refused to allow a defendant to even discover the existence of other contracts the United States government. Specifically, the court stated that "[t]his [c]ourt finds that the KBR's requests for documents relating to other contracts or other parties ***are not facially relevant*** to the case, and KBR has not met is burden in convincing the Court how the information is relevant." *United States v. Kellogg Brown & Root Servs.*, 284 F.R.D. 22, 37 (D.D.C. 2012)(emphasis added). In so ruling, the United States District Court for the District of Columbia noted that "[c]ourts should read 'relevance' broadly, they should not endorse 'fishing expeditions,' discovery abuse and inordinate expense involved in overbroad and far-ranging discovery requests. *Kellogg Brown & Root Servs.*, 284 F.R.D. at 37 (citing *Hardrick v. Legal Servs. Corp.*, 96 F.R.D. 617, 618 (D.D.C. 1983)(internal quotations omitted).

Here there is no relevance whatsoever to the manner in which Remy operated with regard to other business endeavors. What is relevant is the contractual relationship between Remy and

Fisher and whether Remy and Fisher complied with their respective contractual obligations. Whether Remy had a different contract term related to a core right of return program with another warehouse distributer is of no import to whether Remy owns Fisher's cores. Accordingly, this Court should not allow Fisher to introduce such evidence or elicit testimony regard the contractual provisions Remy may or may not have with other customers. Allowing Fisher to do so will undoubtedly confuse the jury and offer no proof as to the contractual relationship between Fisher and Remy.

### c. COUNTERCLAIM DAMAGES

With regard to the counterclaim damages, Fisher has retained Mr. Harold Martin to calculate its damages allegedly caused by Remy's failure to reach a 100% order fill rate. That is, Fisher claims through Mr. Martin, that each and every single order Fisher placed with Remy was required to be filled at a volume of 100% of the parts ordered. However, Fisher's industry standards expert, Mr. Peter Kornafel, opined that the industry standard fill rate in remanufacturing is only 90%. Indeed, Mr. Kornafel testified that Remy should have been concerned when its order fill rate dropped below 90%. Thus, without a doubt, Fisher will not be able to provide any evidence at all that places any fault on Remy for not maintaining a 100% order fill rate. Fisher's own expert will testify that such a fill rate is virtually impossible. This fact is understood by warehouse distributors, such as Fisher, and industry standards require only a 90% fill rate. Indeed, in the APSG Program, Remy did explicitly obligate itself to a monthly order fill of 93%. However, that 93% order fill obligation, explicitly limits any damages which Fisher can recover to a "5% discount" of order fill less than 93% for a given month, but only if Fisher submits such a "request in writing" within 30 days.

With this contract term, Remy and Fisher contemplated order fill issues occurring occasionally, *i.e.*, even Fisher knew 100% order fill was not the standard. To provide Fisher with a remedy for these foreseeable and anticipated order fill issues, Remy and Fisher agreed to a 5% discount that Remy did pay to Fisher. Consistent with the terms of the APSG Program, Remy paid Fisher nearly $200,000.00 in order fill discounts between 2017 and 2018. Accordingly, the Court should exclude any evidence regarding Fisher's alleged lost sales damages, as Remy has already fulfilled its contractual obligations by remitting to Fisher nearly $200,000. In the alternative, and at a minimum, as litigants may not overcome their own testimony and evidence, Fisher should be precluded from seeking any damages in excess of 90%, assuming Fisher is even entitled to recover for its alleged lost sales. *See*, *e.g.*, *Massie v. Firmstone*, 134 Va. 450, 114 S.E. 652 (1922) (holding that a party may not rise above their own evidence); *see also Crawford v. Quarterman*, 210 Va. 598, 603, 172 S.E.2d 739, 742 (1970) (applying the Massie doctrine and stating that a party's case can be no stronger nor rise any higher than his own testimony permits).

Additionally, Fisher also seeks damages for a time in excess of the contractual provisions. Under the terms of the "Keep Competitive Clause" Fisher could have, at any point on or after April 1, 2017, the alleged date when Remy's order fill issues began, provided Remy with notice that Fisher believed Remy was not keeping it competitive, and provided Remy with 60 days to cure the issues. At the end of 60 days, Fisher could have terminated its relationship with Remy, instead of continuing the relationship over the course of approximately an additional 18 months. Fisher agrees with and acknowledges this termination right. See ECF No.187, ¶¶ 6-7. Instead of providing notice to Remy that Fisher was no longer competitive due to Remy's alleged order fill issues, Fisher sat idly by for fifteen (15) months without taking any action, thereby failing to mitigate its damages. Fisher provided Remy with notice that it intended to terminate the

contractual relationship with Remy on June 30, 2018. Providing Remy with this notice is the first time that Fisher sought to enforce its right and obligations and is the time from which the damage calculation should begin for any alleged order fill issues. As Fisher has previously briefed and argued, it had a unilateral termination provision allowing it to cease its contractual relationship with Remy. In allowing fifteen months to lapse before exercising its unilateral termination provision, Fisher failed to mitigate its damages. Fisher had a duty to minimize his damages, which began when Fisher believed that Remy was no longer keeping it competitive. *Monahan v. Obici Med. Mgmt. Servs.*, 271 Va. 621, 636, 628 S.E.2d 330, 339 (2006); *Forbes v. Rapp*, 269 Va. 374, 380, 611 S.E.2d 592, 595–96 (2005); *Fox-Sadler Co. v. Earl E. Norris Roofing Co.*, 229 Va. 106, 111–12, 327 S.E.2d 95, 98 (1985). For these reasons, the Court should limit Fisher's damages, if any, to the sixty (60) days contained within the "Keep Competitive Clause" within the Letters of Understanding.

### d. ACCOUNTING AUDITS

Lastly, Fisher has questioned a number of witnesses regarding routine annual accounting audits done by a third-party accounting firm. Such an annual accounting is commonplace among businesses across the world. In the case of Remy, these annual accounting audits covered the entire scope of Remy's business operations. Further, these annual accounting audits are not specific to any customer and have nothing to do with Fisher specifically. In one of the routine annual accounting audits, the outside third-party accountant found a "material weakness" in the manner in which Remy conducted its core reconciliation process. The supposed "material weakness" related not to the manner in which Remy conducted its core reconciliation process, but instead highlighted the fact that Remy may not have complied with the timing parameters of the core reconciliation. The annual accounting audits are inadmissible for a number of reasons.

Initially, this Court should preclude the admission of the annual accounting audits because the annual accounting audits require expert testimony to explain the term "material weakness" to the jury. Fisher has not designated any individual for that purpose and therefore cannot elicit such testimony on that point. In addition, Fisher has not designated any expert testimony to provide any causal link between the "material weakness" identified in the routine annual accounting audit and any issue(s) in this case.

In addition to failing to designate expert testimony properly, the accounting audits have no relevance whatsoever and must be excluded. Without any evidence connecting the annual accounting audits to Fisher or any issue in this case, there is no purpose for admitting the routine audits or eliciting any testimony regarding them. In this case, the accounting audits do not mention Fisher specifically, do not impugn the process by which core reconciliation occurred, but instead raised a potential issue with the timing of the core reconciliations. Pursuant to Federal Rule of Evidence 402, "[i]rrelevant evidence is not admissible."

Lastly, allowing the admission of the routine accounting audits or any testimony regarding them will be extremely prejudicial to Remy. Without the necessary expert testimony to explain what the term "material weakness" does and does not mean, the jury will have no basis from which to apply the documents to the facts of this case. Therefore, even assuming the routine generic annual audits have some slight probative value, such minimal probative value is extremely outweighed by the prejudice Remy will undoubtedly incur should the routine annual accounting audits be introduced during the upcoming trial.

## V. CONCLUSION

For the foregoing reasons, this Court should grant each of Remy's four (4) motions in limine and preclude Fisher from eliciting testimony or producing evidence regarding Remy's

ownership, other contract terms unrelated to the Remy/Fisher contractual relationship, any damage evidence above its own expert's opinions, and annual audit information.

Dated: December 3, 2021          Respectfully submitted,

**REMY HOLDINGS INTERNATIONAL, LLC**
/s/
Matthew D. Green (VSB No. 46913)
David C. Tait (VSB No. 82710)
Lindsay K. Bunting Eubanks (VSB No. 94686)
**Sands Anderson PC**
1111 East Main Street, Suite 2400
P.O. Box 1998
Richmond, VA 23218-1998
Telephone: (804) 783-7275
Facsimile: (804) 783-7291
mgreen@sandsanderson.com
dtait@sandsanderson.com
lbuntingeubanks@sandsanderson.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of December, 2021, a true and accurate copy of the foregoing was served upon all counsel of record as set forth below:

>Ryan D. Frei
>J. Brent Justus
>Gregory J. DuBoff
>Lyle D. Kossis
>Brooke A. Weedon
>McGuireWoods LLP
>800 East Canal Street
>Richmond, VA 23219-3916
>Telephone: (804) 775-1134
>Facsimile: (804) 698-2168
>rfrei@mcguirewoods.com
>bjustus@mcguirewoods.com
>gduboff@mcguirewoods.com
>lkossis@mcguirewoods.com
>bweedon@mcguirewoods.com

>/s/
>Matthew D. Green (VSB No. 46913)
>David C. Tait (VSB No. 82710)
>Lindsay K. Bunting Eubanks (VSB No. 94686)
>**Sands Anderson PC**
>1111 East Main Street, Suite 2400
>P.O. Box 1998
>Richmond, VA 23218-1998
>Telephone: (804) 783-7275
>Facsimile: (804) 783-7291
>mgreen@sandsanderson.com
>dtait@sandsanderson.com
>lbuntingeubanks@sandsanderson.com