IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

REMY HOLDINGS INTERNATIONAL,           )
LLC                                     )
                                        )
      Plaintiff,                        )     Civil Action No. 5:19-cv-00021
                                        )
v.                                      )
                                        )     By: Elizabeth K. Dillon
FISHER AUTO PARTS, INC.,                )        United States District Judge
                                        )
      Defendant.                        )

**MEMORANDUM OPINION AND ORDER**

Plaintiff Remy Holdings International, LLC (Remy), a manufacturer and supplier of automotive parts and accessories, alleges claims for breach of contract and unjust enrichment against defendant Fisher Auto Parts, Inc. (Fisher), an auto parts warehouse distributor.  Remy alleges that Fisher wrongfully withheld payment of more than six million dollars pursuant to two types of contractual arrangements in the automotive aftermarket—the "core return" program and the "core devaluation credit" program.  Remy also alleges that Fisher wrongfully terminated the parties' contracts.  Finally, Remy brings alternative claims for unjust enrichment and conversion. (Second Am. Compl., Dkt. No. 47.)  Fisher has counterclaimed for breach of contract based on Remy's obligation to keep Fisher competitive in the marketplace and Remy's failure to compensate Fisher for excess core returns.  (Am. Answer and Counterclaims, Dkt. No. 93.)  Trial in this matter is currently scheduled to begin on February 28, 2022.

Before the court are the following motions:[1] (1) Remy's motion to exclude evidence relating to the USA Core Policy (Dkt. No. 133) (this motion will be DENIED); (2) Fisher's

---

[1] The court held hearings on these motions on August 3 and September 15, 2021.

motion to exclude evidence of Fisher's alleged core-related balances with USA Industries and Fisher's alleged aggregate core under-return balances with Remy (Dkt. No. 201) (this motion will be DENIED); (3) Fisher's motion for summary judgment on Count II in Remy's complaint (wrongful termination of contract) (Dkt. No. 140) (this motion will be GRANTED); (4) Remy's motion for summary judgment on Count I in Remy's complaint (Dkt. No. 178) (breach of contract for failing to pay outstanding balances) (this motion will be DENIED); (5) Fisher's motion to exclude testimony and opinions of Stan Gowisnock and Dana Trexler (Dkt. No. 145) (this motion will be GRANTED); (6) Remy's motion to exclude Fisher's expert Peter Kornafel (Dkt. No. 176) (this motion will be DENIED); and (7) Remy's motion to exclude Fisher's expert Daniel Billie (Dkt. No. 174) (this motion will be DENIED).[2]

## I.   BACKGROUND

*Relevant Parties*

Remy Holdings International is a manufacturer and supplier of automotive parts and accessories.  Remy and its parent company, BPI Acquisition Company, serve the automotive aftermarket, developing and distributing products for a wide variety of vehicle makes and models.  Fisher Auto Parts is an auto parts distributor.  Fisher sells aftermarket automotive parts as a warehouse distributor, wholesale dealer, and retailer.  Prior to 2014, Fisher maintained a business relationship with USA Industries.  USA was one of Fisher's primary suppliers.  In January 2014, Remy purchased USA Industries and began doing business as Remy.

*Industry Background*

---

[2] On September 30, 2021, Fisher moved for leave to file a second motion for partial summary judgment. (Dkt. No. 222.)  This opinion does not address that motion.

In the automotive aftermarket space, rotating electrical suppliers like Remy traditionally supply finished products to distributors like Fisher without charging for the core component of the products.  Cores are used components of automobile parts such as starters and alternators which can be remanufactured and reused for future sale.  The distributor thus receives the core without initially paying for it, with the understanding that the supplier has the right to receive a core (or equivalent value) back in the future.  Generally, the distributor regularly returns cores to the supplier during the commercial relationship and periodically performs an inventory reconciliation with the supplier, ultimately paying for any core shrinkage.  This industry practice was known at Remy as the "cashless core right of return" program.  Remy and Fisher engaged in this program for several years.

*KOI Contract*

Following Fisher's purchase of KOI Auto Parts, Fisher and Remy entered into a contract entitled "FISHER AUTO PARTS/REMY USA Rotating Electrical Core Base Agreement" (the KOI Contract).  Pursuant to the KOI Contract, "As of January 1, 2017, there was a remaining 'core ledger balance' of $433,245.47 in relation to KOI.  To be clear, REMY has already paid KOI the agreed upon core reduction monies and will not pay Fisher any further amount." (Second Am. Compl. Ex.C at ¶ a, Dkt. No. 47-3.)[3]

The KOI Contract further provides that "Remy agrees to reduce the 'core ledger balance' liability (or any obligation to pay back) of $433,245.47 by 33% per year or $144,415.16 per year in monthly installments of $12,034.59 beginning on 6/1/17." (*Id.* at ¶ b.)  The contract also provides that "[i]n the event there is an early termination before 12/30/2020 of this agreement for

---

[3] Fisher disputes the characterization of this document as the "KOI Contract."  Instead, Fisher refers to the document as the "Core Base Agreement."  (Fisher's Response to Remy's Statement of Undisputed Fact ¶ 6, Dkt. No. 183.)  The court will call it the KOI contract.

any reason, Fisher shall pay to Remy $12,034.59 times the number of months remaining until the end of the 36 months."  (*Id.* at ¶ c.)

On June 18, 2018, Remy received notice that Fisher intended to terminate the KOI Contract on or about August 18, 2018.  Fisher directed its warehouse to stop returning cores to Remy, effective July 1, 2018.  (*See* Ex. 22, Fisher's Opp'n to Remy's Mot. for Summ. J., Dkt. No. 172-21 (email stating "We will stop all core returns to Remy on 7/1/18").)

As a result of Fisher's early termination, on August 17, 2018, Remy invoiced Fisher the KOI core balance amount, $252,726.39, requesting payment in 90 days.

*Hoffman Contract*

Following Fisher's purchase of Hoffman Brothers Auto Parts, Fisher and Remy entered into a contract entitled "FISHER AUTO PARTS/REMY USA Rotating Electrical Core Agreement Hoffman Acquisition" (Hoffman Contract).  The Hoffman Contract provides that "In consideration of the REMY USA Industries Letter of Understanding and as a result of the Hoffman acquisition Remy agrees to pay an additional 'core ledger balance' amount of $94,949.04."  (Second Am. Compl. Ex. D at a, Dkt. No. 47-4.)

The Hoffman Contract further provides that "Remy agrees to pay to Fisher the full amount of this 'core ledger balance' over 3 years in 36 equal monthly credits of $2,637.47 provided Fisher converts the competitive branded product to Remy Branded product on Rotating Electrical."  (*Id.* at ¶ b.)  The contract also provides that "if Fisher changes over REMY to another brand in Hoffman Brothers stores within the next 36 months, Fisher shall pay to REMY $2,637.47 times the number of months remaining until the end of 36 months."  (*Id.* at ¶ c.)

Fisher provided its 60-day notice to Remy on June 18, 2018, that Fisher was switching suppliers and terminating the Hoffman Contract.  As a result of Fisher switching suppliers, on

August 17, 2018, Remy invoiced Fisher the Hoffman Brothers core balance amount, $71,211.81, to be paid in 90 days.

*Other Contractual Terms*

Sometime in late 2004, Bo Fisher, CEO of Fisher, drafted an unsigned document entitled "USA Core Policy" which laid out that USA would zero bill Fisher for cores, would participate in a core devaluation program with Fisher, and would compensate Fisher for cores in their inventory after they were devalued to zero.  (Ex. I, Remy's Mot. for Summ. J., Dkt. No. 152-12.) This document is the subject of Remy's motion in limine based on the statute of frauds.

Fisher and USA entered into two Letters of Understanding (LOU), one dated December 15, 2011, and a second dated December 11, 2012.  (*See* Exs. J, K, Remy's Mot. for Summ. J., Dkt. Nos. 152-13, 152-14.)  Fisher disputes that the 2011 LOU was ever executed by the parties but admits that the 2012 LOU was agreed to and signed by the parties.  (Fisher's Response to Remy's Statement of Undisputed Facts ¶ 27, Dkt. No. 183.)

Both LOUs explained that "Core Devaluation Monies will be paid to Fisher on each acquisition, USA is in the process of paying down Fisher cores and this multi-year effort will continue until Fisher cores are paid off."  (Ex. J ¶ 6, Ex. K ¶ 8.)

A memo drafted by Michael Gravelle on December 12, 2013, for Jay Pitta, CEO of Remy, states that "The Fishers contract is in LOI form but is signed by both parties and appears to be binding.  This LOI appears to cover a 5-year relationship intent of each party, starting on 12/19/2012."  (Ex. L, Dkt. No. 152-15.)

Remy acquired the assets and liabilities of USA in January of 2014 pursuant to an Asset Purchase Agreement.

Frank Doria, who negotiated with Fisher on behalf of USA and then worked for Remy after the acquisition of USA, emailed Michelle Bitner of Remy in February of 2015 to explain that pricing in the core relationship comes from the standard Federated Program and included the benefits in the Fisher/USA LOUs.  Federated is an industry buying group comprised of warehouse distributors of which Fisher is the largest member.  Federated later merged with another buying group to form Automotive Parts Services Group (APSG).

Fisher, Remy, and USA agreed to a "First Amendment to the Letter of Understanding" on January 21, 2015.  (Ex. P, Dkt. No. 152-19.)  The 2015 Amended Agreement cited the Federated Rebate as part of the price term for cores.  It did not cite to or include the USA Core Policy.

Both USA and Remy offered rotating electrical group programs through Federated and APSG.  Federated and APSG contracts explained terms for core pricing using the "No Core Billing" system and valued cores at "'J' less 10% off current Jobber core price."  (Exs. Q, R, Dkt. Nos. 152-20, 152-21.)  These contracts included "Core Relief Programs" whereby Remy took 100% of core ownership off a warehouse distributor's balance sheet as long as it purchased Remy products.  Fisher's corporate designee, Gregory Haan, admitted that Fisher utilized the terms outlined in the APSG contract with Remy.

An accounting entry from March 31, 2015, made by Monica Bolt of Remy, reflects transfer of the core balance of the USA owned core in Fisher's possession to Remy in the amount of $792,915.09.  (Ex. T,[4] U (Dep. Tr. of Monica Bolt 205–06), Dkt. Nos. 152-23, 152-24.)

---

[4] Fisher argues that this document is inadmissible.

In two memos written on April 11, 2016, Bolt described the core right of return process, which "does not require the customer to be billed for the value of the core at the time of shipment of the finished product but ensures that a return of an equal core will be made at a later date"; the other described the core liability process, which "requires the customer to be billed for the core price at the time of shipment of the finished product." (Ex. V,[5] Dkt. No. 152-25.)

In the case of Remy's accounting policies, the inventory value of cores is recorded as a Noncurrent Asset in the Core Right of Return account. As cores are returned, the core value is placed into Core Inventory. Remy served as Fisher's primary supplier of cores until June 2018, when Fisher decided to end this supply relationship. Throughout their supply relationship, Fisher also returned cores to Remy without the exchange of any additional money.

At the end of the Remy-Fisher relationship, Fisher retained 130,810 cores valued at $6,904,039. (Exs. aa, bb, Dkt. No. 152-2.) Fisher entered a new supply relationship with Motorcar Parts of America, Inc. (MPA). MPA paid $6.5 million for the 130,810 cores in Fisher's possession. (Exs. cc, dd, Dkt. Nos. 152-5, 152-7.)

*Remy's Performance Issues*

Significantly, the 2015 First Amendment to the Letter of Understanding confirmed the parties' relationship for an additional five-year period starting January 1, 2015, and included a termination provision. That provision stated:

> Remy shall take best efforts to ensure that Remy provides competitive products to Fisher compared to similar competitive products sold under the same market conditions and if this doesn't occur in Fisher's opinion then Fisher can change suppliers and end this contract with as little as 60 days of advance notice; in such case Fisher shall not owe REMY any additional monies (except for payment for products ordered prior to the date of termination and the pro rata amounts listed below).

---

[5] Fisher argues that this document is inadmissible.

(First Amendment to the Letter of Understanding ¶ 2.)

In 2017, shortly after it changed ownership for the third time in three years, Remy's performance started to decline, which included failure to timely fill Fisher's purchase orders. Within the automotive industry, parties often use the phrase "order fill" to refer to the rate at which a supplier timely fills a customer's orders. For example, a supplier that fills 94% of a customer's order within a set time would be said to have a 94% order-fill rate for that order.

Frank Doria, the former USA executive who managed the Fisher relationship and continued to serve as the primary liaison for Fisher when he worked for Remy, explained that keeping a customer competitive includes, among other things, timely filling a customer's orders. (Ex. 3, Doria Dep. 162–63, Dkt. No. 187-3.)  Matthew McGuire, former Remy Vice President of Sales, confirmed that timely filling a customer's orders was essential to keeping customers competitive in the market.  (Ex. 19, McGuire Dep., Dkt. No. 187-19.)  David Nichols, former President of Remy and Remy's Rule 30(b)(6) designee on the Remy/Fisher contractual relationship, testified that "Remy knew that keeping Fisher competitive in the marketplace in every way was an essential purpose of the [parties'] agreement."  (Ex. 6, Nichols Dep. 430, Dkt. No. 187-6.)  David Overbeeke, the President of Brake Parts, Inc., a company that provided managerial oversight of Remy's rotating-electrical operations from 2016 to 2018, likewise confirmed that "delivering the product on time" and "at a certain fill rate and consistency" were essential components to keeping customers competitive in the rotating-electrical aftermarket. (Ex. 8, Overbeeke Dep. 271, 305, Dkt. No. 187-8.)  Jay Pittas, former Chief Executive Officer at Remy, testified that "competitive order fill rates" were a key component of keeping customers competitive.  (Ex. 11, Pittas Dep. 259–60, Dkt. No. 187-11.)

To keep a customer competitive, Remy needed consistent order-fill rates in the low-to-mid 90s.  Doria testified that while he worked at USA, "95 percent" was their standard order-fill rate.  (Doria Dep. 225.)  McGuire likewise agreed that a 95% order-fill rate "is a pretty standard rate and custom in the industry."  (McGuire Dep. 112–13.)  Nichols agreed that Remy's order fill rate needed to be in the low-to-mid 90s: "[O]ur minimum fill rate has always been 95 percent . . . . [T]raditionally we're a mid 96 and as high as 97 percent fill rate company."  (Nichols Dep. 97.)  Overbeeke testified during his deposition that "95 is the industry standard" fill rate.  (Overbeeke Dep. 278.)  Several documents confirm this understanding.  (*See* Ex. 24 (Bostic email explaining that Remy's fill rate for Fisher should be "100%," and that "if we fail we will land somewhere [around] the 97% we need to be"); Ex. 25 ¶ 5 (stating that "Remy's order fill rate is consistently in the mid to high nineties"); Ex. 26 ¶ 7 (same); Ex. 27 ¶ 7 (guaranteeing "93% or higher monthly order fill").)

Fisher produced order-fill data showing Remy's monthly order-fill rates to Fisher between August 2016 and June 2018.  (Ex. 28.)  The worksheet shows that during the 14-month period between March 2017 and May 2018, Remy's monthly order-fill rate never rose above 80%, and Remy's monthly order-fill rates during this time were consistently in the 60s and 70s.  Remy even had a fill rate of 9% in January 2018.  (*Id.*)  Remy's own order-fill data shows that its fill rates were nearly always well below the low-to-mid 90s threshold that Remy needed to maintain to keep Fisher competitive.  (Ex. 29.)  Remy's individual fill rates on orders were sometimes in the 40s and 50s, and Remy's own document reports an average first shipment fill rate to Fisher between December 2017 and July 2018 of 80.4%.  (*Id.*)

Nichols testified that Remy's operational challenges hampered its fill rates.  He explained that because of Remy switching computer systems, Remy's customers "certainly experienced a

lower fill rate," and admitted that Remy's fill rates were "inconsistent." (Nichols Dep. 482.) Nichols recalled Fisher repeatedly "expressing some concern to Remy about some order fill problem" at least as early as "September of 2017." (*Id.* at 515.) Nichols testified that he "felt bad about it" and "didn't shy away" from discussing the issues with Remy's customers. (*Id.* at 493.) Nichols recognized that the fill-rate issue was not caused by Remy's customers: "[W]e accept responsibility. The fill rate issue is ours." (*Id.* at 519.) Nichols testified that the fill rates were so bad they were "embarrassing." (*Id.* at 492–93.) Gary Bostic, a former Vice President of Sales and Remy's designated point of contact for the APSG program, agreed that the "whole situation" surrounding Remy's order-fill troubles were "embarrassing." (Ex. 16, Bostic Dep. 194–95, Dkt. No. 187-16.) Bostic also testified that Remy's order-fill issues were "across-the-board," and that Remy became "pretty much an equal opportunity poor filler." (*Id.* at 170–71.) He also confirmed that Remy's performance issues continued up through the sale of Remy to another supplier in early 2019. (*Id.* at 45–46.)

Pittas testified that after he left Remy, he heard of "operational challenges" hampering Remy's business, including its lagging order fill. (Pittas Dep. 278.) Pittas stated that Nichols, who was Remy's President at the time, vented to him that Remy's order fill was a "disaster," and that Remy was "having real problems." (*Id.* at 280.) Overbeeke testified that Remy did not meet its fill-rate obligations to many customers in 2017 and 2018. (Overbeeke Dep. 277–79.) Overbeeke also noted that Fisher repeatedly contacted Remy in 2018 to complain about Remy's poor fill rates. (*Id.* at 294–96.)

Greg Haan, Fisher's Chief Operating Officer, testified that with respect to Remy's order-fill rates in 2017 and 2018, he had "never been in a situation like this" with such poor order fill and where the vendor was not "manufacturing product." (Ex. 2, Haan Dep. 196, Dkt. No. 187-

2.)  Haan testified that Remy's order fill was so bad that Fisher was "getting zero shipments for weeks at a time."  (*Id.* at 274.)  Bo Fisher, Fisher's Chief Executive Officer, testified similarly. (Ex. 1, Fisher Dep. 167–68, Dkt. No. 187-1; *see also* Declaration of Arthur Fisher (Fisher Decl.) ¶¶ 5–12, Dkt. No. 141.)

In a September 2017 e-mail, Fisher complained to Doria about "REMY issues," including the fact that "[o]rder fill last week was 37% and has been 45% over the last 6 weeks."  (Ex. 30.) Fisher complained to Doria again in March 2018, stating that "order fill on REMY is terrible" and Fisher was "losing lots of sales."  (Ex. 31.)  In another March 2018 email, Fisher told Bostic and Nichols that in his "30 full time years, I've never seen anything this bad," that Remy's performance had been "catastrophic," and that "[n]othing was shipped on the orders that we were promised would ship more than a month ago.  We were misled."  (Ex. 32.)  Fisher sent other emails to Remy in 2018 complaining about Remy's performance issues, including its poor order-fill rates.  (Exs. 33, 34.)

Beyond timely shipping orders, Remy's obligation to keep Fisher competitive also required Remy to provide Fisher with, among other things, competitive pricing, good customer service, a broad product line, and high-quality products.  Doria explained that to keep a warehouse distributor competitive, a supplier has to provide good "pricing," "order fill," "order turnaround," and a broad product line.  (Doria Dep. 161–62.)  McGuire similarly testified that to keep a customer competitive, a rotating-electrical supplier like Remy has to "make sure the product is priced competitively" and "offer correct products from a [stock keeping unit] perspective."  (McGuire Dep. 49.)  Nichols provided a similar laundry list of items that a supplier must provide to keep its customers competitive, including "a good product," "help from a training standpoint," meeting "new product demands," ensuring "coverage for late model

applications," "good customer service," "responsiveness to a customer's concerns," and "having an expansive inventory to meet" a customer's requirements.  (Nichols Dep. 430–31.)

Remy personnel understood that Remy was at risk of losing Fisher's business.  In a June 2017 email, Nichols acknowledged that Fisher "is growing and our fill rate is not supporting the growth."  (Ex. 35.)  A March 2018 email showed Nichols "apologiz[ing] for the fill rate issue" and explaining that "it is certainly my company's issue."  (Ex. 36.)  In an April 2018 email, Bostic stated that Remy was "at great risk" of losing Fisher's business because of Remy's performance issues.  (Ex. 37.)

Remy also removed certain items from its product line.  In an email from Haan to Bostic, Haan asked for a "list of numbers Remy does not intend to ship."  (Ex. 38.)  Bostic responded by attaching a spreadsheet that listed many part numbers Remy could not ship, which led to a shortened product line.  (*Id.*)  Bostic explained that the list of constrained parts reflected products that Remy "could not supply due to various shortages."  (Bostic Dep. 209.)  According to Bostic, Remy did not want to have a shortened product line because it impacts their order fill and threatened a "potential loss of the customer."  (*Id.*)

Doria agreed that while at Remy, he "observed a loss of institutional knowledge within the organization" due to "changes in ownership."  (Doria Dep. 139.)  There was a "loss of key personnel" with each ownership change.  (*Id.* at 140.)  McGuire testified that there were "operational changes, from a distribution channel standpoint, that caused disruption with the accounts."  (McGuire Dep. 91.)  He explained that these challenges led to "orders that were being slow to process" and that fill rates "were becoming more of a challenge, with regard to the service level of the business."  (*Id.* at 91.)  McGuire also testified that Remy's performance suffered after Remy moved some manufacturing facilities to Mexico, which led to the business

"becoming more fragmented." (*Id.* at 92–93.) And when McGuire left Remy before Fisher terminated the relationship, McGuire submitted a detailed resignation letter that catalogued the performance issues while he worked there. McGuire stated that he never would have chosen to stay with Remy after it acquired USA if he had known about the "pending changes planned or future direction" of the company. (Ex. 39.) Doria stated that in his "nearly five decades in the aftermarket auto parts supply business," he never "encountered order fill problems as severe as what was happening at Remy between 2017 and 2018." (Doria Dep. 242.)

According to Remy, Remy and Fisher contemplated order fill issues occurring occasionally. To provide Fisher with a remedy for these foreseeable and anticipated order fill issues, Remy and Fisher agreed to a 5% discount that Remy paid to Fisher. (Ex. M, Dkt. No. 158-13.) In the APSG Program, Remy explicitly obligated itself to a monthly order fill of 93%. However, that 93% order fill obligation explicitly limits any damages which Fisher can recover to a "5% discount" of order fill less than 93% for a given month, but only if Fisher submits such a request in writing within 30 days. (Ex. D, Dkt. No. 158-4; Dkt. No. 47-1.) Remy paid Fisher nearly $200,000 in order fill discounts between 2017 and 2018. (Ex. M.)

## II.   DISCUSSION

### A.  Remy's Motion to Exclude Evidence Related to the USA Core Policy (Dkt. No. 133)

As noted above, Remy moves to exclude evidence related to the USA Core Policy. (*See* Dkt. Nos. 152-12, 134-3.) This is a one-page, unsigned document that purportedly memorializes an oral agreement between Frank Doria and Bo Fisher that Fisher owned its core inventory. Remy argues that the USA Core Policy does not satisfy Virginia's statute of frauds. *See* Va. Code § 8.2-201 (Formal requirements; statute of frauds).

The statute of frauds provides that "a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker."  Va. Code § 8.2-201(1).  Exceptions are for specially manufactured goods, party admission of the oral contract, and oral contracts for "goods for which payment has been made and accepted or which have been received and accepted."  *Id.* § 8.2-201(3)(a–c).

Remy argues that the statute of frauds applies to bar evidence of the USA Core Policy because it is uncontroverted that the parties engaged in the sale of goods exceeding $500, and none of the exceptions apply.  Remy explains that Fisher's reliance on this oral contract is problematic because there is no contemporaneous evidence that anyone at Remy or Fisher considered the USA Core Policy document or its terms to be operative between the companies until the litigation began.  According to Remy, it is as though the USA Core Policy did not actually exist.

Remy complains that Fisher focuses on the final sentence of the document, which states: "The net result is that the cores are wholly owned by Fisher at the end of this process."  (Dkt. No. 134-3.)  Remy states that Fisher does not read that sentence in a manner consistent with the rest of the document and the other agreements between the parties as applying only to: (1) cores obtained by Fisher before 2005; (2) to the extent core investment in them had not yet been paid off by Remy; and (3) in the event that Fisher ended the supply agreement before all 144 payments were made.  Rather, Fisher reads that last sentence in a manner that is inconsistent with the rest of the document and treats it as a standalone trump card negating the clear terms and intent of the rest of the document.

14

The statute of frauds does not apply because the USA Core Policy is not a contract for the sale of goods.  Instead, it serves as an "outline" of "steps" the parties would follow as part of the Fisher core devaluation program.  (Ex. 2, Dkt. No. 149-3.)  The document does not specify a quantity of goods or the price for those goods, and the document does not require Fisher to buy goods or obligate Fisher to purchase a minimum amount of goods.  It is unlike the purchase orders used between Fisher and USA /Remy.  (*See, e.g.*, Ex. 17, Dkt. No. 149-18.)

The USA Core Policy was also incorporated into signed agreements between the parties. *See Logistics Transp. Co., Inc. v. Timber Trucking Co., Inc.*, 141 F.3d 1158, 1998 WL 200321 (4th Cir. 1998) (unpublished disposition).  In *Timber Trucking*, the Fourth Circuit held that the statute of frauds did not bar the admission of an unsigned agreement even though "the signed writing does not expressly refer to the unsigned writing" because the signed writing shows "substantial connection with" the unsigned writing, and "both documents relate to plaintiff's agency duties in relation to defendant's trucking business."  *Id.* at *3.  Here, the parties incorporated the USA Core Policy into subsequently signed agreements.  For example, the 2012 LOU expressly referenced the monthly payments that originated and were detailed exclusively in the USA Core Policy.  (Ex. 12, Dkt. No. 149-13.)

Even if the statute of frauds were to apply, the USA Core Policy document is admissible because it fits within two exceptions: (1) the confirmation of an oral agreement exception and (2) the party-admission exception.

First, a contract "between merchants" is not subject to the statute of frauds where (1) within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, and (2) no written notice of objection to its contents is given within ten days after it is received.  Va. Code § 8.2-

201(2).  Because USA (Remy's predecessor in interest) never objected to the USA Core Policy after it received the document, Fisher has shown that the confirmation of an oral agreement exception applies.

Second, the statute of frauds does not apply when "the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made."  Va. Code § 8.2-201(3)(b).  Here, both USA and Remy personnel have confirmed the validity of the USA Core Policy.  Both Doria and Mr. Fisher testified that USA and Fisher negotiated and entered into the USA Core Policy.

For these reasons, the court will deny Remy's motion to exclude evidence related to the USA Core Policy.

## B.  Fisher's Motion to Exclude Evidence of Fisher's Alleged Core-Related Balances With USA Industries and Fisher's Alleged Aggregate Core Under-Return Balances with Remy (Dkt. No. 201)

Fisher seeks to exclude two categories of information: (i) documents purporting to show that Fisher owed USA a core-related balance when Remy bought USA and (ii) Remy spreadsheets reporting aggregate core-related balances for which Remy has not produced any underlying records.

Fisher cites Federal Rule of Evidence 1006, which provides that the "proponent may use a summary, chart, or calculation to prove the content of voluminous writing, recordings, or photographs," but that the "proponent must make the originals or duplicates available for examination or copying."  Under this rule, summary charts may be admitted into evidence "as a surrogate for underlying voluminous records that would otherwise be admissible into evidence." *United States v. Simmons*, --- F. 4th ----, 2021 WL 3744123, at *14 (4th Cir. Aug. 23, 2021) (citing *United States v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004)).  "While the Rule does not

require that the underlying documentation actually be introduced into evidence, it does require that the documents be made available to the opposing party for examination and copying at a reasonable time and place." *Janati*, 374 F.3d at 272–73. If the underlying records are not produced, then the summary is inadmissible. *See, e.g.*, *Hill v. Bd. of Sup'rs of Stafford Cty., Va.*, 996 F.2d 1211 (4th Cir. 1993) (Table) ("The district judge has discretion to admit summaries into evidence, provided that the underlying evidence is admissible and available to the opponent so that a proper cross-examination may be had."); *Elliot v. Kiesewetter*, 112 F. App'x 821, 823 (3d Cir. 2004) (summaries admissible only if "the underlying originals be made available for examination"); *United States v. Miller*, 771 F.2d 1219, 1238 (9th Cir. 1985) (documents inadmissible under Rule 1006 because "the government failed to provide appellants with a copy of the underlying documents").

Fisher argues that all the documents it seeks to exclude are inadmissible because Remy did not produce the records underlying that summary evidence. Remy argues that Rule 1006 does not apply because the summary documents are business records and thus admissible as an exception to the hearsay rule. *See* Fed. R. Evid. 803(6). This exception applies if: (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Remy explains that it incorporated USA records into its own records following Remy's acquisition of USA. These records became the records of Remy, which Remy relied upon and

utilized in running and maintaining its business.  When USA was still operating, USA employees made entries into the USA accounting system.  Following Remy's purchase of USA, Remy used and maintained that accounting system before transferring the data into its own accounting system.  At each step, a person with knowledge made the entry in the ordinary course of business.

In support of its position, Fisher cites a Fourth Circuit case which held that evidence which qualifies for the business records exception under Rule 803(6) is still inadmissible if not made "available for examination or copying pursuant to Rule 1006."  *United States v. Laguerre*, 119 F. App'x 458, 461 (4th Cir. 2005).  Fisher also relies on a district court case which explained that "[o]nce the proponent of a summary has established that certain records are, in fact, business records, a summary of those records is admissible under Rule 1006, *subject to that rule's separate requirements*."  *BP Amoco Chem. Co. v. Flint Hills Res., LLC*, 697 F. Supp. 2d 1001, 1033 (N.D. Ill. 2010).  Remy relies upon a Ninth Circuit case which held that Rule 1006 does not apply if the summaries *themselves* are the business records.  *U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040, 1045–46 (9th Cir. 2009).

The court agrees with Remy and finds that the cases cited by Fisher are distinguishable.  In *LaGuerre*, the government "sought to take toll records excepted from the hearsay rule under Rule 803(6) and authenticated under Rule 902(11) and summarize them into a chart pursuant to Rule 1006."  119 F. App'x at 460.  Thus, the underlying records were the business records, not the summary.  Similarly, in *BP Amoco*, the documents underlying the summary charts were the business records.  697 F. Supp. 2d at 1032–33.  In those cases, Rule 1006 must be followed because the summaries are being admitted "as a surrogate for underlying voluminous records that would otherwise be admissible into evidence."  *Janati*, 374 F.3d at 272.  Here, by contrast, it

appears that the summaries used by Remy are the actual business records, as was the case in *U-Haul.* 576 F.3d at 1045–46 ("They were the writings at issue, not summaries of other evidence. Thus, Rule 1006 does not apply."). In other words, the summaries are not stand-ins for underlying records that must otherwise be admissible. Rule 1006 is therefore inapplicable.

Fisher also argues that the documents purporting to show that Fisher owed USA a core-related balance violate the original-document rule, which provides that an "original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." Fed. R. Evid. 1002. This rule, also known as the "best evidence rule," applies to the circumstance where the proponent seeks to prove the content of a document. The rule "exists to afford guarantees against inaccuracies and fraud by requiring that *the original* of the document be offered, subject to exceptions in Rule 1003 (allowing the use of duplicates) and Rule 1004 (providing exceptions to the requirement of an original)." *United States v. Smith*, 566 F.3d 410, 413 (4th Cir. 2009) (emphasis in original). "Dating back to 1700, the rule requires not, as its common name implies, the best evidence in every case but rather the production of an original document instead of a copy. Many commentators refer to the rule not as the best evidence rule but as the original document rule." *Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1318 (9th Cir. 1986).

Fisher argues that the original-document rule is violated because the Fisher balances from USA were copied from ledgers and documents that USA gave to Remy. Fisher's motion targets a Remy-created spreadsheet, created nearly three years after acquiring USA, which tracked Fisher's alleged "Core Right of Return" balance with Remy. (Dkt. No. 203-2.) As noted above, Remy will elicit the testimony of Monica Bolt regarding the preparation of the accounting records at issue. Remy will be seeking to prove the contents of the spreadsheet, not the

underlying documents that were used to create the spreadsheet.  *See, e.g.*, *Tompson v. House, Inc.*, Civil Action No. 09-1942 (BAH/JMF), 2011 WL 6794939, at *3 (D.D.C. Dec. 28, 2011) (rejecting Rule 1002 argument where plaintiff used documents to prepare a spreadsheet that memorialized days worked, gross income received, and payments made because plaintiff sought to "prove the content of the spreadsheet, not the contents of the documents upon which it was based.  Hence, Rule 1002 is inapplicable"); *see also* Rule 1002, Advisory Committee Note (explaining that "an event may be proved by nondocumentary evidence, even though a written record if it was made . . . .  For example, payment may be proved without producing the written receipt which was given.  Earnings may be proved without producing the books of account in which they are entered").  Moreover, a printout of a spreadsheet is an original that satisfies Rule 1002 by Rule 1001, which provides that for electronically stored information, "'original' means any printout—or other output readable by sight—if it accurately reflects the information."  Rule 1001(d); *Tompson*, 2011 WL 6794939, at *3.  For these reasons, the original-document rule is inapplicable.

Finally, Fisher argues that the Remy spreadsheets are double hearsay because they were "prepared by a [Remy] employee with information supplied by another person [USA personnel]."  *Andrew v. United States*, 91 F. Supp. 3d 739, 749–50 (M.D.N.C. 2015).  In other words, while the documents themselves might be business records, the underlying information from USA presents another layer of hearsay.  Remy maintains that it can validate the underlying information as a USA business record through the testimony of Ms. Bolt, who had access to a USA employee, Les Wittekind, who was available to answer any questions for Bolt and assist her in accessing or evaluating the USA records.  *See, e.g.*, *Ramus, Inc. v. Infineon Techs. AG*, 348 F. Supp. 2d 698, 703 (E.D. Va. 2004) (explaining that to validate a document as a business

20

record, "the custodian or qualified witness must not only be familiar with the maintenance of the

records, but also with how they are created").

The court agrees with Remy that it is at least possible that Ms. Bolt can validate the

underlying information as a USA business record.  Therefore, the court will deny the motion to

exclude without prejudice to this issue being revisited at a later stage of the proceedings.

## C.  Fisher's Motion for Summary Judgment on Count II in Remy's Complaint – Wrongful Termination of Contract (Dkt. No. 140)

Fisher moves for summary judgment on Count II of Remy's Second Amended Complaint

(Breach of Contract—Wrongful Termination of Contract).  For the reasons stated on the record

at the hearing, Fisher's motion will be granted.

## D.  Remy's Motion for Summary Judgment on Count I in Remy's Complaint – Breach of Contract for Failing to Pay Outstanding Balances (Dkt. No. 178)

Summary judgment should be granted if "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A material fact is

one that "might affect the outcome of the suit under the governing law."  *Spriggs v. Diamond*

*Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986)).  A dispute of material fact is "genuine" if sufficient evidence favoring the

non-moving party exists for the trier of fact to return a verdict for that party.  *Anderson*, 477 U.S.

at 248–49.

The moving party bears the initial burden of showing the absence of a genuine dispute of

material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party makes this showing, however,

the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits

or other means permitted by the Rule, set forth specific facts showing that there is a genuine

issue for trial.  *See* Fed. R. Civ. P. 56(c), 56(e).  All inferences must be viewed in a light most favorable to the non-moving party, but the nonmovant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

When a federal district court exercises jurisdiction over state law claims pursuant to diversity of citizenship, the court must apply the law of the relevant state (in this case, Virginia) on all substantive matters, including the necessary elements of a cause of action.  *See* 28 U.S.C. 1652; *In re Lipitor*, 892 F.3d 624, 646 (4th Cir. 2018).  Virginia sets forth three necessary elements of a breach of contract claim: (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant breached such obligation; and (3) the plaintiff was injured because of defendant's breach.  *Cyberlock Consulting, Inc. v. Info. Experts, Inc.*, 939 F. Supp. 2d 572, 578 (E.D. Va. 2013) (citing *Ulloa v. QSP, Inc.*, 624 S.E. 2d 43, 48 (Va. 2006)).

Remy argues that it is entitled to summary judgment on its relationship with Fisher as to the core returns.  Here, Remy argues that Fisher failed to return its cores when the relationship was terminated, sold the cores to MPA, and failed to reimburse Remy.  Remy argues it is entitled to the value of the cores, $6,904,039, on this claim.

Fisher argues that Remy is not entitled to summary judgment under the first material breach doctrine.  Under Virginia law, a party who commits the first material breach of a contract is not entitled to enforce the contract, and the breach excuses the nonbreaching part from future performance.  *Bayer Cropscience LP v. Albemarle Corp.*, 696 F. App'x 617, 622 (4th Cir. 2017).  Conversely, if "a contracting party . . . is guilty of only trivial breaches of contract," then that party has substantially complied, and while "substantial compliance or substantial performance 'does not constitute a complete defense to liability for breach of contract,'" the adverse party is

still obligated to perform under the contract. *Scott v. Clarke*, 355 F. Supp. 3d 472, 504 (W.D. Va. 2019) (quoting *Ballou v. Basic Constr. Co.*, 407 F.2d 1137, 1140 (4th Cir. 1969)).

Fisher maintains that Remy materially breached the parties' contracts beginning in April 2017 when severe performance issues hampered Fisher's competitiveness. This was well before Fisher allegedly breached the parties' contract in August 2018. Remy's order-fill issues are well-documented and the opposite of trivial. (*See* Overbeeke Dep. 278 (testimony that "95 is the industry standard" fill rate); Ex. 28 (worksheet showing that during the 14-month period between March 2017 and May 2018, Remy's monthly order-fill rate never rose above 80%; Remy's monthly order-fill rates during this time were consistently in the 60s and 70s; and Remy had a fill rate of 9% in January 2018)). As stated in the termination provision of the January 21, 2015 Amendment, "Remy shall take best efforts to ensure that Remy provides competitive products to Fisher compared to similar competitive products sold under the same market conditions and if this doesn't occur in Fisher's opinion then Fisher can change suppliers and end this contract with as little as 60 days of advance notice" and "in such case Fisher shall not owe REMY any additional monies." (First Amendment to the Letter of Understanding ¶ 2.) At minimum, there are issues of fact as to whether the breach was material. These fact issues preclude the entry of summary judgment for Remy.

Remy also argues that it is entitled to at least partial summary judgment as to the KOI Contract and the Hoffman Contract as to liability. Remy believes it is entitled to $216,623 for the KOI Contract and $72,212 for the Hoffman Contract, conceding there may be an issue of fact as to these damages. Fisher argues again for application of the first material breach doctrine based on Remy's performance issues. The KOI and Hoffman Contracts, executed on October 12, 2017, contain language suggesting that Remy is entitled to monies if Fisher ends the

relationship before a certain date.  (*See* KOI Contract ¶ c ("In the event there is an early termination before 12/30/2020 of this agreement for any reason, Fisher shall pay to REMY $12,034.59 times the number of months remaining until the end of the 36 months."); Hoffman Contract ¶ c ("[I]f Fisher changes over REMY to another brand in the Hoffman Brothers stores within the next 36 months, Fisher shall pay to REMY $2,637.47 times the number of months remaining until the end of the 36 months.").)  However, the KOI and Hoffman Contracts explicitly recognize the existing LOU, as amended on January 21, 2015, stating that it is "concurrent," and that "together with the REMY USA Industries Letter of Understanding dated 1-21-2015 . . . constitutes the full and binding agreement between the parties."  (*See id.*)  The early termination language in the January 2015 Amendment, under which Fisher owes Remy nothing if Remy violates the keep competitive clause, at least arguably supersedes the payment language in the KOI and Hoffman Contracts.  Fact issues regarding the applicability of the first material breach therefore preclude the entry of summary judgment in favor of Remy.

## E.  Motions to Exclude Expert Testimony

Federal Rule of Evidence 702 and the standards established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern admissibility of expert testimony.  Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Before considering whether a proffered expert's testimony is reliable, the court first determines whether the witness qualifies as an expert.  A witness may qualify as an expert on the basis of "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  The expertise must relate to the areas in which the expert is expressing opinions.  *See Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 800 (4th Cir. 1989).  Exclusion should occur only where all bases for expertise are lacking with regard to the issue for which the opinion is offered, and a proffered expert "need not be precisely informed about all details of the issues raised in order to offer an opinion."  *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) (quoting *Thomas J. Kline, Inc.*, 878 F.2d at 799).

While the test for exclusion may be a "strict one," *Kopf*, 993 F.2d at 377, some type of relevant expertise is nonetheless required.  For example, where experience is one of the bases for a witness's expertise, the witness must "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts."  *Radiance Found., Inc. v. Nat'l Ass'n for the Advancement of Colored People*, 27 F. Supp. 3d 671, 674 (E.D. Va. 2013) (alteration in original) (citations omitted).  Additionally, a witness's expertise must be tailored, to some degree, to the specific opinions offered and the particular facts in the case; general expertise or knowledge on a broad topic or general field may be insufficient, depending on the facts of a case.  *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391–92 (D. Md. 2001) ("The fact that a proposed witness is an expert in one area, does not *ipso facto* qualify him to testify as an expert in all related areas.") (citing *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 247 (4th Cir. 1999)).

After ensuring that an individual qualifies as an expert, this court has an obligation under *Daubert* to act as a gatekeeper and ensure that any testimony concerning scientific, technical, or other specialized knowledge offered in support of a party's claim is "not only relevant, but reliable." 509 U.S. at 589; *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting same). The proponent of the testimony must establish admissibility, although the proponent need not prove that the expert's theory is correct. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001); *Md. Cas. Co. v. Therm–O–Disc, Inc.*, 137 F.3d 780, 783 (4th Cir. 1998). First, the trial court must ask whether proffered scientific evidence is valid and reliable. *United States v. Barnette*, 211 F.3d 803, 815 (4th Cir. 2000). Second, the court asks whether the evidence will help the trier of fact, which is generally a question of relevance, or "fit." The court must ask if, assuming the evidence is reliable, it will "assist the trier of fact to understand or determine a fact in issue." *Md. Cas. Co.*, 137 F.3d at 783 (quoting *Daubert*, 509 U.S. at 592).

The court's role in limiting expert testimony is important: "due to the difficulty of evaluating their testimony, expert witnesses have the potential to be both powerful and quite misleading." *Cooper*, 259 F.3d at 199 (citations omitted). Indeed, "given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999).

Finally, Rule 704(a) allows the admission of expert testimony that "embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a). In other words, questions of fact that are committed to resolution by the jury are the proper subject of opinion testimony. *United States v. McIver*, 470 F.3d 550, 561 (4th Cir. 2006). However, opinion testimony that states a

26

legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible. *Id.* at 562 (citing *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002)).

### 1. Fisher's motion to exclude Stan Gowisnock and Dana Trexler (Dkt. No. 145)

Stan Gowisnock has worked in the automotive business sector for over 35 years in various capacities. Gowisnock has been the CEO and President of Cardone Industries, a leading global automotive remanufacturer, and the CEO-President of DST, Inc., where he helped digitalize its automotive supply chain. He has a B.S. in computer engineering. (Gowisnock Report, Ex. 17, Dkt. No. 150-18.)

Dana Trexler is the Managing Director of the Disputes, Compliance, and Investigations Group at Stout, a global investment bank and advisory firm specializing in corporate finance, financial disputes, and investigations. Trexler has over 25 years of experience providing litigation consulting services calculating and testifying to the damages in intellectual property and complex commercial disputes. She has a B.S. in accounting and an M.B.A.

Gowisnock opined in his report that "The proper accounting for Cores on the financial statements and tax filings of warehouse distributors is outlined in the publication, *Accounting & Taxation Principles for Cores in the Remanufacturing Industry*, dated January 2017 [the MERA Publication]." (Ex. 17 at 14.) Thus, Gowisnock opined that "The proper accounting for Cores on Fisher's financial statements and in its tax filings is outlined" in the MERA Publication. (*Id.* at 19.)

Fisher argues that Gowisnock does not have the scientific, technical, or other specialized knowledge to render this opinion. Fisher also argues Gowisnock's opinion regarding the MERA Publication is not based on sufficient facts or reliable methods. As the court explained at the

hearing, the court will grant Fisher's motion to exclude Gowisnock's testimony regarding the MERA Publication.

As for Trexler, Fisher argues that her opinion should be excluded because it is connected to Gowisnock's MERA opinion. She relies on Gowisnock for her conclusion that the MERA Publication is applicable to Fisher. (Trexler Report 16, Ex. 46, Dkt. No. 150-44.) Trexler confirms that the "only basis" for her assertion that the MERA Publication applies to Fisher is Gowisnock's report. (Trexler Dep. 144–45, Ex. 47, Dkt. No. 150-45.) She then used the MERA Publication throughout her analysis of Fisher's accounting treatment of cores.

At the hearing, Remy agreed that Trexler would not testify that the MERA Publication acts as guidance for Fisher's accounting treatment of cores. On that understanding, the court will grant the motion to exclude Trexler's testimony regarding the MERA Publication only.

### 2. Remy's motion to exclude Peter Kornafel (Dkt. No. 176)

Fisher named Kornafel as an industry expert qualified to testify as to core programs used and on the importance of fill rates and industry standards for fill rates in the aftermarket auto parts industry. Fisher designated Kornafel as an expert witness and as a rebuttal expert. Kornafel worked with his own company, Hatch Grinding Company, until 1996. He was president of CARQUEST Corp. from 1996 until 2001. Since 2001, Kornafel has worked as a consultant in inventory management for aftermarket distributors and suppliers.

Kornafel opines that there are no industry standards for the key factual disputes in this case: standard core programs, return policies for rotating electrical, core reconciliations, supplier changeover, termination rights, and any related issues. Kornafel stated that there are "different programs for different people." (Kornafel Dep. 90, Ex. 3, Dkt. No. 153-2.)

Regarding the USA Core Policy document, Kornafel explains "I'm not here to give you a legal opinion about who owns the cores, one way of the other. But I think that the document is pretty straightforward in what it says, that at the conclusion of the deal that was outlined in that program, it says, quote Fisher would own the cores." (*Id.* at 102.) When asked whether he believed Fisher owned the cores, Kornafel states, "I believe the document speaks for itself, and it says that they would." (*Id.* at 102.) He "believes that that document should be considered. It was—you know, the two people that negotiated both gave testimony that that was the program; and that process was followed from 2005 to the end of the relationship, even by Remy. So, while that document isn't signed, I believe that it was, in fact, how they did business with each other for more than 10 years." (*Id.* at 103.)

Remy argues that Kornafel's expert testimony should be excluded in its entirety because his experience in the after-market auto-parts industry is outdated and irrelevant. Kornafel has only worked part-time for the last 20 years, and in the last 5 years, he has only worked a couple hundred hours. Kornafel has not served on a relevant industry-wide auto care committee in ten years. He has depth of experience in the automotive after-parts industry prior to 2001, but the industry has changed significantly since then. During his time, companies paid a core charge, so he has no experience with distributors charging zero dollars for cores.

However, Kornafel has approximately 60 years of experience in the automotive aftermarket. This includes working at a warehouse distributor, buying remanufactured products, returning cores, negotiating buying group programs with core-related provisions, being the president of an automotive buying group, joining and actively participating in an automotive consulting firm that advises both manufacturers and distributors, holding countless leadership positions in various aftermarket organizations, winning many awards recognizing his expertise

and contributions to the aftermarket, and writing a textbook on inventory management. Therefore, the court finds that Kornafel is qualified to offer expert testimony.

Remy also argues that Kornafel's opinion regarding core industry practices are not based on his experience in the field.  Because he has no experience with zero core billing, Kornafel's opinion is based on his subjective reading of various documents and deposition testimony. Further, Kornafel was speculating about the meaning of documents and the parties' relationship while averring the lack of any industry standards.  His testimony on core practices is not based on any specialized knowledge he has gained in his work with the after-market auto-parts industry.  Thus, Remy asks the court to exclude all of Kornafel's proposed opinions and testimony as they relate to core ownership.  From the Burden of Proof Report, this includes Section C, D, and E.  (Kornafel Report, Dkt. No. 153.)  From the Rebuttal Expert Report, this includes proposed testimony regarding core dealings in paragraphs 6 through 41.  (Kornafel Rebuttal Report, Dkt. No. 153-1.)  At the hearing, Remy informed the court that it was no longer challenging paragraphs 16 through 24 in the Rebuttal Report.

Contrary to this line of argument, Kornafel has remained active and engaged in the automotive aftermarket industry after he stepped down as President of CARQUEST in 2001. Kornafel can opine on certain programs and practices even if he did not personally participate in those programs and practices.  Kornafel's opinions will not be excluded simply because he disagrees with Remy's substantive view about purported industry standards.

Finally, Remy argues that because Kornafel does not believe that there are industry standards regarding core practices, and thus cannot rely on his experience to offer opinions on that issue, Kornafel's opinions must be excluded as improper legal conclusions.  From the Burden of Proof Report, this includes paragraphs 84, 85, 86, 87, 96, 107, 112, and 113.

(Kornafel Report.)  From the Rebuttal Report, this includes paragraphs 7, 15, 16, 17, 19, 20, 21, 29, 31, and 32.[6]  (Kornafel Rebuttal Report.)

At the hearing, Fisher agreed that it would be impermissible for Kornafel to offer legal conclusions.  Instead, Fisher argues, Kornafel is explaining and offering background about contracting practices and industry terms of art.  The court has reviewed these paragraphs and concludes that Kornafel does not offer legal conclusions or provide legal interpretations of the contracts at issue.  To use one example from Kornafel's report:

> After reviewing the documents and evidence produced in this case, it is my opinion that based on the core-related arrangements that Fisher had with Remy, Fisher used the proper methodology to calculate whether it over- or under-returned cores to Remy. Excluding the universe of cores the parties agreed that Fisher "wholly owned" in the 2005 Core Policy, Fisher's core program with USA that continued with Remy required it to return one core to USA (later Remy) for every rotating-electrical product that Fisher bought from USA (later Remy) . . . . To determine whether Fisher returned too many or too few cores to Remy during the parties' relationship, Fisher should compare the total number of products purchased from Remy and the total number of cores returned to Remy during the course of the parties' relationship.  Remy personnel who provided deposition testimony in this case agreed that to determine whether Fisher under- or over-returned cores to Remy, one should compare Fisher's product purchases against its core returns.  For example, Monica Bolt, a former senior financial officer at Remy, agreed that "to get an accurate calculation of an under-return balance, Remy compares the individual purchase records to the individual core return records." . . . Mr. Nichols likewise agreed that comparing product purchases to core returns "is what ultimately tells you whether the customer has met that one-for-one exchange goal" under Fisher's core program with USA . . . . And Mr. Caruso—Remy's Rule 30(b)(6) designee for core-related calculations—agreed that "[i]f Remy wants to figure out how many cores a customer has to return," it would "look up how many remanufactured products the customer paid for without a core deposit." . . . He also agreed that "to calculate a potential core shrink or core under-return balance," Remy simply "subtract[s] the number

---

[6]  As noted above, Remy withdrew its challenge to many of these paragraphs in the Rebuttal Report.

> of cores that customer returned from the number of remanufactured
> products the customer bought" without a core deposit . . . .

(Kornafel Report 87 (internal citations omitted).)  Here, Kornafel's opinion is not that Fisher

followed the contract or did not breach the contract.  Instead, he is saying that Fisher used the

right methodology based upon Kornafel's understanding of the facts and data and evidence.

Kornafel bases his opinions on industry-specific experience, not an interpretation of the parties'

contracts.  The court may revisit this ruling at trial if Kornafel's testimony crosses the line into

contract interpretation.  However, because Remy's experts have offered testimony that there is

an industry standard, Fisher can offer expert testimony to say that there is no one-size-fits-all

industry standard for all companies to follow.

For these reasons, the court will deny Remy's motion to exclude expert testimony from

Mr. Kornafel.  Of course, given the court's ruling on Fisher's motion for summary judgment,

there is no need for Kornafel to testify regarding fill rates.

### 3.  Remy's motion to exclude Daniel Billie (Dkt. No. 174)

Fisher named Daniel Billie as an industry expert qualified to testify as to core programs

used by Remy and Fisher, the automotive aftermarket treatment of cores, supplier contracts and

negotiations, competitiveness of the automotive aftermarket, and inventory management

practices.  Billie worked at Cardone, a remanufacturer for automotive parts, from 1995 until

2014.  He started in sales and later worked with mergers, acquisitions, and strategic decision

making.  Billie consulted with various companies after 2014.  Billie was named as a rebuttal

expert.

Like Kornafel, Billie opined that there are no industry standards for reduction of core

inventory investment, around core charges, around core relief monies, or about core ownership.

(Billie Rebuttal Report, Dkt. No. 154-1.)  He stated at his deposition: "There were variations of—core relief, significant numbers and variations.  To pigeon hole it into an industry standard of one, two, or three, in my opinion shows that many who opine about that weren't there at the time it was happening because it was the wild west, but there's varied definitions and varied ways that manufacturers went about the process of—of providing that core relief."  (Ex. 2, Billie Dep. 73, Dkt. No. 154-2.)  Billie based his opinion on "Fisher's significant growth period of 13 years from 2005 to 2018" and speculated "there was a strong likelihood that there was and could have been a plausible over-returned status."  (*Id.* at 105.)  On the issue of core ownership, Billie opined that he could determine ownership by looking at a written "agreement or contract, if there is one with—with a—between a remanufacturer and a customer."  (*Id.* at 79.)

At the hearing, Remy clarified that it was not seeking blanket exclusion of Billie's rebuttal opinions based on any lack of experience.  In addition, Remy limited the paragraphs it was seeking to exclude to paragraphs 21–24, 33, 34, and 36.  The problems identified by Remy with these paragraphs are similar to its objections to Kornafel's testimony—that they are either cumulative reading and selective reading of deposition testimony or involve Billie's interpretation of a contract.

The court has reviewed the paragraphs at issue and agrees with Fisher that Billie is not offering legal opinions or interpreting contracts.  Instead, Billie explains the typical contracting practices in the industry as context for understanding some of the agreements and programs at issue.  For example, Billie explains that "[a]lthough it might have been the best practice to secure signatures, the reality is that did not always happen in the aftermarket, as long as both parties negotiated, agreed to, and followed the terms of the policy."  (Billie Rebuttal Report ¶ 34.)  Here,

Billie is explaining contracting practices, not opining on contractual duties and obligations. Therefore, the court will deny Remy's motion to exclude expert rebuttal testimony by Billie.

### III.   CONCLUSION

For the reasons stated in this opinion, it is HEREBY ORDERED as follows:

1.  Remy's motion to exclude evidence relating to the USA Core Policy (Dkt. No. 133) is DENIED;

2.  Fisher's motion to exclude evidence of Fisher's alleged core-related balances with USA Industries and Fisher's alleged aggregate core under-return balances with Remy (Dkt. No. 201) is DENIED;

3.  Fisher's motion for summary judgment on Count II in Remy's complaint (Dkt. No. 140) is GRANTED;

4.  Remy's motion for summary judgment on Count I in Remy's complaint (Dkt. No. 178) is DENIED;

5.  Fisher's motion to exclude testimony and opinions of Stan Gowisnock and Dana Trexler (Dkt. No. 145) is GRANTED with respect to testimony concerning the MERA Publication;

6.  Remy's motion to exclude Fisher's expert Peter Kornafel (Dkt. No. 176) is DENIED; and

7.  Remy's motion to exclude Fisher's expert Daniel Billie (Dkt. No. 174) is DENIED.

The Clerk of Court is directed to provide a copy of this memorandum opinion and order to all counsel of record.

Entered: January 21, 2022.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge